No. 581 August 21, 2024 463

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL ROBERT RAY JACKSON,
*Defendant-Appellant.*

Grant County Circuit Court
22CR29547; A180386

Robert S. Raschio, Judge.

Argued and submitted June 17, 2024.

Carla E. Edmondson, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Kate E. Morrow, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JACQUOT, J.

Reversed and remanded.

**JACQUOT, J.**

In this criminal appeal, a jury found defendant guilty of driving under the influence of intoxicants (DUII), ORS 813.010. Defendant assigns error to the trial court's refusal to instruct the jury on the choice-of-evils defense. He contends that the trial court was required to instruct the jury on that defense because there was some evidence to support each element. The state argues that the trial court correctly refused to provide the choice-of-evils instruction. We reverse and remand.

We review for legal error a trial court's refusal to provide a requested jury instruction, and in doing so, we view the record in the light most favorable to the requesting party. *State v. Paul*, 289 Or App 408, 409, 410 P3d 378 (2017). "A defendant is entitled to have the jury instructed on a defense if the instruction correctly states the law and if there is any evidence to support" each element of the defense. *State v. Whiteley*, 331 Or App 585, 586, 546 P3d 956 (2024). "[T]he choice-of-evils defense is one that, when properly raised, the state must negate beyond a reasonable doubt, ORS 161.055(1)[.]" *State v. Phillips*, 317 Or App 169, 171-72, 503 P3d 1282 (2022) (internal quotation marks and citation omitted).

Thus, the trial court must instruct the jury on the choice-of-evils defense, as provided by ORS 161.200, unless the record is devoid of evidence that would allow the jury to find these three things regarding the defendant:

> "(1) his conduct was necessary to avoid a threatened injury; (2) the threatened injury was imminent; and (3) it was reasonable for him to believe that the need to avoid that injury was greater than the need to avoid the injury that *** the statute that he was found to have violated *** seeks to prevent."

*Id.* at 174 (internal quotation marks and citation omitted; ellipses in *Phillips*). When we review the record to determine whether there was any evidence to support each of those elements, we view the evidence in the light most favorable to defendant, the proponent of the instruction. *Id.* at 172. "For purposes of that determination, the 'quantum' of evidence

is irrelevant, *State v. Brown*, 306 Or 599, 603 n 3, 761 P2d 1300 (1988), as is the existence of contrary evidence, *State v. Costanzo*, 94 Or App 516, 518 n 1, 766 P2d 415 (1988). '[T] he court's role is not to weigh the evidence, but merely to determine if any evidence would support the defense.' [*Id.*] at 518 n 1." *State v. Clowdus*, 326 Or App 36, 38-39, 530 P3d 525 (2023).

With those standards in mind, we recount the evidence supporting the choice-of-evils defense, as well as some relevant context.

Defendant, who, at the time of these events, was retired, traveled off and on in a van, and often parked it overnight on "pull-offs" and forest roads because he could not afford campsite fees. On a day in June, he pulled his van onto a graveled area adjacent to Highway 395. There were no signs or gates on the property. Defendant always checked for "No Trespassing" signs. He planned to stay there for the night. Between 6:15 and 8:00 p.m., defendant drank a little more than two beers.

Around 8:00 p.m., the property's tenant arrived. In his car, the tenant "zoomed up" next to defendant's van and skidded to a stop. The tenant glared at defendant and said, "Who the hell are you?" When defendant answered that he was "hanging out for the night," the tenant responded, "Well, you're on my private property and you need to F'ing leave now."

Defendant testified that he was fearful about getting into a physical altercation with the tenant for multiple reasons. He described himself as "a 61-year-old with back problems" and the tenant as "a much younger guy." He considered that if any physical altercation took place, it "isn't going to help me. I'm gonna end up hurt." Defendant also considered that he was in a rural area where "a lot of people have guns." Defendant characterized the tenant's demeanor during the encounter as "aggressive." He described the tenant as having "a glare and a stare. And I did not want to see the next step, which could have been a big one." Defendant thought that he was "in no position to fight anybody." Defendant felt that he was "okay" to drive under the

circumstances; he started his van and drove away. The tenant "stared" at him "the whole time." Defendant felt that it was "absolutely" unsafe for him to stay at the property, and he did not feel that it was unsafe for him to drive.

The tenant testified that defendant was "very respectful" and polite, did not argue, and left immediately after being told to leave. Tenant had a gun in his truck that he retrieved and placed in his hip holster. The property had previously had a sign indicating that it was private property and listed an individual to contact for inquiries about mining gold, but it was gone—perhaps the wind blew it away. Some time since the encounter with defendant, the tenant moved a number of large boulders to block the entrances to the property.

After defendant pulled onto the road, he looked in his rearview mirror and saw a vehicle that was the same color as the tenant's vehicle. He thought that the tenant was following him, and "was catching up" to him. Defendant was "panicked and freaked out" as he drove, because he thought "that this altercation could keep going and get even worse." In addition, "[t]here was no place for [him] to pull over at any point[.]" He testified, "If I saw another place that I could pull off, I would have." He also explained that, because he thought the tenant was following him, he was concerned about "pulling off and allowing him to come up right behind me, again[.]" Defendant was "on edge."

After defendant had been driving for about five minutes, the speed limit changed from 50 to 30 miles per hour as he approached Canyon City. But defendant did not see the speed limit sign until it was too late, because he was looking in his mirrors for the car behind him. He was pulled over for speeding because he was traveling 40 miles per hour.

Defendant was "fully" cooperative with the State Trooper who stopped him. Defendant was still "freaked out," his "adrenaline was going," and he was in a panic. He told the trooper what had happened and that he had felt that he was being chased. There were empty "alcohol containers" and an odor of alcohol in defendant's van. Defendant performed field sobriety tests, in which the trooper observed

two "clues" for each eye during the horizontal gaze nystagmus test, but no "clues" during the walk-and-turn test or the one-leg-stand test. Other than defendant's speed, the trooper had not observed any signs of poor driving prior to stopping defendant. Defendant ultimately provided a breath sample that registered as 0.11 blood alcohol content, and he was charged with DUII.

At trial, defendant sought a jury instruction on the choice-of-evils defense; it was discussed pre-trial and the trial court deferred ruling until the close of evidence. At the close of evidence, the state objected to the court instructing the jury on the defense, arguing that there was insufficient evidence that defendant had no choice but to drive while intoxicated, and that there was insufficient evidence that the threatened harm persisted until the time that defendant was stopped for speeding. The trial court denied the instruction. In the course of ruling, the court explained that there *was* sufficient evidence of the three elements of the defense at the outset of defendant driving.

> "Certainly, the court would find that [defendant] had the—would have the right to have a jury instruction read if he had left that property and gone to the next place to pull over and parked. The testimony is that he was—feared he was being followed. However, the contrary testimony offered by the defense is, he wasn't."

The trial court determined that choice-of-evils would allow driving and stopping at the first place that he could pull over. But the trial court concluded that defendant's statements on cross-examination undercut his defense.

> "So under cross-examination, the district attorney asked [defendant] if there were other places for him to pull over, prior to him being stopped in Canyon City, and his answer was, there was not a place where I could park for the evening."

The trial court appears to have understood defendant's statement on cross that there was no place that he could have parked for the night as expressing his only concern, and the court discounted (or perhaps did not recall) defendant's statements that, before he was stopped, "[t]here was no place for me to pull over at any point," and that he was

concerned about "pulling off and allowing [the tenant] to come up right behind me, again[.]"

We reiterate that, when determining whether a defendant is entitled to an instruction on the choice-of-evils defense, the facts must be viewed in the light most favorable to the defendant. When a defendant gives inconsistent testimony, typically it is for the jury to decide what part of the testimony to credit, if any. As we explained in *Whiteley*, "Although it is true that defendant's testimony, primarily on cross-examination, could undermine his defense at times by contradicting some of his direct examination testimony, no legal principle compels the factfinder to believe defendant's most damaging" testimony on cross-examination and to disbelieve the testimony he gives that supports his defense. 311 Or App at 589. Further, in this instance, the testimony is not necessarily contradictory. Defendant could have had more than one consideration in mind in deciding to continue driving.

Viewing the evidence in the light most favorable to defendant and drawing reasonable inferences, a reasonable factfinder could find the following. Defendant pulled off the road onto a graveled area that had no gates or signs. Believing it to be public property, he thought it was a place where he could spend the night in his van. Thinking he had stopped for the night, defendant drank a few beers. The tenant abruptly and aggressively arrived and confronted defendant in a hostile manner. He ordered defendant off of his property. Defendant reasonably feared that the confrontation might become physical, that he would not be able to defend himself against the tenant, that he would likely be hurt, and that it was possible that the tenant had a gun. Because he thought he could drive safely, defendant thought that it would be better for him to drive despite having consumed a little more than two beers, than it would be to stay on the property and continue the confrontation, which he felt was absolutely unsafe.

After pulling onto the road, defendant was concerned that the danger remained or had escalated, because he believed that the tenant was following him and was catching up. Defendant did not consider it safe to pull over

anywhere before the point where he was stopped, because he remained concerned that the tenant would resume the confrontation if he pulled over, and that he would be hurt in a physical altercation. Defendant's driving was not noticeably impaired, at least over a short time of observation. Defendant's assessment of the tenor of the confrontation between himself and the tenant is supported by defendant's testimony as well as inferences that may be drawn from the tenant's testimony that defendant left immediately, without arguing, after the tenant told him to leave, and that the tenant immediately retrieved a gun from his car and holstered it on his hip when defendant was 100 yards away.

On appeal, the state argues, as an alternative ground for affirmance, that there was insufficient evidence that defendant faced a threat of imminent injury at the time that he decided to drive. As the trial court did, we conclude that there was sufficient evidence to support that element, and we reject that argument without further discussion.

The state also argues, as it did below, that there was insufficient evidence for the jury to find that defendant had no reasonable alternative but to drive, thus committing DUII, and that, even if there was no reasonable alternative at the outset, the circumstances justifying defendant's decision to drive had ended at some time before he was stopped for speeding. The state's view of the evidence is inconsistent with our standard of review. As previously noted, considering the evidence in the light most favorable to the proponent of the instruction means that we do not attempt to resolve conflicts in the evidence, including in a defendant's own testimony. If the testimony provides evidence to support giving the instruction, that evidence is considered in the analysis. If there is sufficient evidence on each element of the defense, then it will be for the jury to resolve any conflicts.[1]

---

[1] The state acknowledges that "disputed evidence is typically not a basis for denying a requested jury instruction[.]" But, it argues, citing a civil case addressing summary judgment, *Henderson-Rubio v. May Dept. Stores*, 53 Or App 575, 583-85, 632 P2d 1289 (1981), that "a party ordinarily cannot create an evidentiary dispute by contradicting their own testimony." We do not see how "creating an evidentiary dispute" has any relevance in this context where the existence of an issue of material fact is not part of the analysis at all.

In sum, there was evidence in the record from which a factfinder could reasonably find that (1) defendant's conduct was necessary to avoid a threat of injury; (2) the threat was imminent; and (3) it was reasonable for defendant to believe that the need to avoid the threat of harm was greater than the need to avoid the harm that the statute that he violated seeks to prevent. The trial court therefore erred by not giving the choice-of-evils instruction. We also conclude, in light of all of the evidence, that the error was not harmless.

Reversed and remanded.